UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| CRYSTAL STINSON, DDS, PHD, § | |
| § | |
| Plaintiff, § | |
| § | |
| V. § | CIVIL Case No. _____ |
| § | |
| DANIEL JONES, DDS, § | |
| DR. JOSHUA LIESCHESKI, DDS, and § | |
| KEVIN MCGINNIS, § | |
| Defendants. § | |

**PLAINTIFF'S ORIGINAL COMPLAINT**

Plaintiff Dr. Crystal Stinson, DDS, PhD ("Stinson" or "Plaintiff") files this her Original Complaint against Dr. Daniel Jones, Dr. Joshua Liescheski, and Kevin McGinnis, and would show as follows:

**I.     PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff is an individual who resides in the Dallas County portion of Cedar Hill, Texas.

2. Defendants are Dr. Daniel Jones, Dr. Joshua Liescheski, and Kevin McGinnis, three individuals who are current and former employees of Texas A&M University, operating through the School of Dentistry and/or the Texas A&M University College of Dentistry (University).

3. Defendants Daniel Jones and Joshua Liescheski engaged in a conspiracy to deny the civil rights of Plaintiff as detailed below by a systemic pattern of harassment based on race and/or retaliation for Stinson complaining about racial discrimination for the purpose of either

engineering her termination and/or forcing her to resign her employment. Unfortunately, each has a long pattern of similar racial harassment and retaliation.

4.      Defendant McGinnis currently serves as the University's Vice President of Operations and Chief Compliance Office. McGinnis is sued in his individual capacity as he was "personally involved in the alleged constitutional deprivation of civil rights because he is "alleged specifically to have directed, supervised, participated in, authorized or even to have condoned by knowing acquiescence the specific incident upon which this claim for relief is based." *See, e.g., Hall v. Tawney*, 621 F.2d 607, 615 (4th Cir. 1980).

5.      It was clearly established law at the time of the events in question that a state university Professor could not be harassed and treated differently because of her race or in retaliation for her complaints of racial discrimination.

6.      In his compliance duties at the relevant times in this matter, McGinnis had the duty to stop the harassment and civil rights violations of Stinson. However, McGinnis abandoned his duties, decided it was more important to protect the reputation of the University that to do his job and stop the harassment and civil rights violations. By refusing to protect Stinson and instead by trying to sweep her allegations under the proverbial rug, McGinnis became a co-participant, by action and/or omission, in her harassment.

7.      Each Defendant was acting under the color of law and in their individual capacity for purposes of Section 1983 when they engaged in the acts or omissions against Dr. Stinson that violated her civil rights under Section 1983.

8.      Defendant Dr. Daniel Jones may be served at any place where he may be found, including at his current place of business:

Dr. Daniel L. Jones, DDS
3302 Gaston Avenue
Dallas, TX 75246

9.  Defendant Dr. Joshua Liescheski may be served at any place where he may be found, including at his place of business:

Dr. Joshua Liescheski, DDS
1104 North Greenville Avenue
Allen, TX 75013

10. Defendant Kevin McGinnis may be served at his office:

Texas A&M University
Office of the President
1246 TAMU
Texas A&M University
College Station, TX 77843-1246

11. This Court has subject matter jurisdiction over this employment related civil rights case pursuant to 15 U.S.C. § 1221 and 28 U.S.C. §§ 1338(a) (b) because Plaintiff is asserting federal civil rights violations under 42 U.S.C. Sections 1981 and 1983.

12. This Court has personal jurisdiction over all of the Defendants because each was within the State of Texas and within this District during all or part of the complained of conduct.

13. Venue is proper pursuant to 28 U.S.C. Section 1931(b)(2) in the Dallas Division of the Northern District of Texas because the vast majority of the events alleged in this matter occurred within Dallas County within the Dallas Division of the Northern District.

## II.   FACTUAL BACKGROUND

A.   **Stinson Worked in a Hostile Environment**

7.  Stinson was hired by the Texas A&M University College of Dentistry (University) in 2014 and was promoted to the role of Assistant Professor in the Department of Public Health Sciences in 2017.

8. As an Assistant Professor, working at the Dallas College of Dentistry, Stinson worked with a variety of people. However, she reported directly to Defendants Dr. Daniel Jones and Dr. Joshua Liescheski, who were her supervisors.

9. Throughout Stinson's employment, she often received good performance reviews and volunteered for extra work to aid other faculty members when needed. Stinson was also in charge of spear-heading the department's participation in research for the Cancer Prevention and Research Institute of Texas (CPRIT).

10. Stinson's initial work environment was pleasant. However, in January of 2019, this began to change. Liescheski began spewing rude comments, demeaning attitudes, and accessing and monitoring Stinson's patient files in violation of HIPPA laws. HIPPA were not the only laws that Liescheski was violating.

11. Around the same time, Liescheski was arrested for possession of cocaine. Despite these troubling occurrences, Stinson was warned by another faculty member to not report Liescheski's actions to Jones because this is how retaliation started in that case. Unfortunately, for Stinson, it was too late, and she began experiencing retaliation.

1. **The Torment from Stinson's Bosses Begins in September of 2019**

12. In September of 2019, Liescheski contacted Stinson while she was waiting to have a steroid spinal injection, a necessary medical procedure for a back injury. Stinson had appropriately scheduled time off, and everyone in the office knew that she would be out for the day. Despite this, Liescheski contacted Stinson to falsely inform her that patients were waiting for her at the clinic. This was later proven to be false because Stinson had no patients scheduled to come in that day. Despite this, Liescheski told Stinson that she may not schedule medical appointments during her clinical days. This caused Stinson to be afraid to take medical time

from work. Subsequently, to comply with Liescheski's demand, Stinson scheduled her next two procedures on her only non-clinical days. This feat caused Stinson several hundreds of dollars because she had to schedule the procedures at an out of network clinic.

13.     To resolve the growing tension with Liescheski, Stinson emailed Jones's assistant to set up a mediation meeting. The meeting was initially set for Wednesday, September 25, 2019, but was later postponed by Jones. Stinson attempted to reschedule a date but was never responded to by Jones or his assistant. While the mediation meeting was waiting to occur, Liescheski went out of his way to undermine Stinson's abilities as a medical professional. Liescheski changed Stinson's treatment plans for patients, told patients that she had no authority to care for them, and repeatedly checked Stinson's charts and notes in violation of HIPPA. Following these events, Stinson attempted to set another mediation date. Unfortunately, this third attempt to mediate was also ignored by Jones. No mediation meeting ever took place.

   **2.   The Suffering Intensifies After Stinson is Falsely Accused of Stealing**

14.     While Stinson's mediation attempts were being unduly ignored, Jones's assistant reached out to Stinson to set a meeting to discuss a renewal letter and salary increase. This meeting was set to occur on October 7, 2019. When Stinson arrived at the meeting, she was ambushed with Jones falsely accusing Stinson of stealing $1,400 in travel funds from the University. Despite proving her innocence, Stinson was never given an apology for the false accusation or the way that it occurred. Further, the accusation was shared with other faculty members that Stinson worked with, causing them to question Stinson's integrity.

15.     Despite the tension between Liescheski and Stinson, on October 10, 2019, Stinson agreed to fill in for Liescheski in the Agape Clinic. While filling in, Stinson came across two missing clinical notes. Stinson was able to identify one of the notes as Liescheski's but

could not ascertain to whom the other note belonged. To figure this out, Stinson sent a friendly email to the staff asking to whom the note belonged. Approximately twenty minutes after she sent the email, the clinical manager for the clinic arrived at the clinic to discipline Stinson for sending the email.

16. Stinson was informed by the manager that Jones felt that Stinson was attempting to throw Liescheski under the bus, and that Jones had sent the manager specifically to inform Stinson of this. While Stinson was able to prove this was not the case, Stinson still received a rude and threatening email from Liescheski concerning the note. In the email, Liescheski threatened to tell the entire office if Stinson ever made a mistake on her clinic days. Though completely in the right, Stinson replied to Liescheski explaining the miscommunication and apologizing for any misunderstanding. She received no reply from Liescheski.

17. Liescheski has previously been reported for several missing notes in the past and it was investigated by risk management.

18. Despite having dozens of missing notes documented and sent to the investigator, the risk manager determined that the claims were unsubstantiated. This begs the question of whether claims are properly being investigated by risk management and suggests that certain faculty members are immune to discipline.

3. **Stinson's Concerns for Safety During the Covid-19 Pandemic Earned Her More Retaliation.**

19. On June 10, 2020, after the COVID-19 Pandemic began, Jones pushed his faculty members to continue to work during unprecedented and risky times. Shockingly, Jones pushed the faculty members to work without proper PPE.

20. Stinson was concerned about not having proper protective gear and communicated this concern to Jones. Jones ignored Stinson's concerns. In addition, when there

were COVID exposures or diagnoses within the clinic, faculty-members were not properly notified. Jones stated that he did not notify faculty about an outbreak in the office simply because he believed it was a rumor.

21. On June 11, 2020, the faculty within the department received the results of their department chair reviews. After reviewing the results, it became apparent how differently faculty members are treated within the department.

22. Noticeably, minority faculty members had less support and access to resources than non-minority faculty. As a result, these members received lower reviews than others. Further, the comments contained in these reviews show that other faculty members felt as though they were being harassed in the workplace and nothing was being done about it.

23. Stinson's request to have set clinic days in accordance with her employment contract were ignored by Jones. On June 14, 2020, Stinson emailed Jones to create a set clinical schedule. Stinson was working extra days in the clinic to be a team-player and help other faculty members.

24. However, Stinson needed to devote time during the week to perform research for the CPRIT project, so she could no longer work the extra days. Initially, Stinson's request was met by unprofessional comments by Jones. Eventually, Jones stopped answering altogether.

4. **Stinson's Boss, Dr. Jones, Makes a Terrorist Death Threat and His Tyrannical Behavior Towards Stinson Worsens**

25. On July 17, 2020, Stinson overheard Jones state that he was going to blow another faculty member's head off and strangle him to death. The other faculty member was a minority. Further, Jones stated that he planned to make a false report that two minority faculty members were having an affair, in an attempt to have them fired.

26. Concerned, Stinson reported this incident to the University's Risk Manager, Kevin McGinnis to investigate. However, rather than investigate, McGinnis attempted to cover the incident up. During the email correspondence where Stinson reported the event to McGinnis, McGinnis was more concerned with who knew about the incident than getting to the actual truth. McGinnis asked Stinson to not report the incident to anyone, including the University Provost or Dean of Faculties.

27. Additionally, McGinnis did not report the violent death threat to the Dallas Police Department. He did not report the threat because he believed it was an internal matter. McGinnis was later pressed by Stinson to report the matter to the police, however, McGinnis responded by stating that Jones's threat was "all bark and no bite."

28. Out of fear for her safety, Stinson communicated to McGinnis that she wanted her report to remain anonymous. She also indicated that she wanted to be re-assigned to another department, without hesitation. Stinson feared that she would be retaliated against by Jones if he found out about her report. Unfortunately, both requests were ignored.

29. Approximately three days later, on July 20, 2020, Stinson was notified by Larry Keller, a Civil Rights investigator, that another faculty member reported Jones's racial and gender discrimination. Stinson was named as a witness in the second investigation.

30. Accordingly, Stinson provided documentation in her possession that proved Jones's discrimination. Stinson also provided a statement of her personal attacks and experiences. Despite this evidence, the result of the investigation was that the claims were unsubstantiated. The other faculty member appealed the results of the investigation twice. Each time the results came back as unsubstantiated.

5. **Jones Retaliates Against Stinson for Reporting His Death Threat**

31. On July 28, 2020, McGinnis informed Stinson that he would notify Jones concerning the death threat investigation. Coincidently, on July 31, 2020, Jones's retaliation against Stinson worsened. Jones began to impede Stinson's efforts to treat patients and run her CPRIT project. Jones told Stinson falsities to prevent her from getting the needed medication for a smoking cessation patient. This caused Stinson to pay out of pocket for the medication.

32. Further, Jones suddenly began to limit Stinson's actions when executing the CPRIT project, often requiring pre-approval to conduct research. Before Jones interjected himself into Stinson's research, Stinson never needed approval to run the project. Jones was historically hands-off and only required prior approval after he learned of Stinson's report.

6. **The University Ignored Jones's Death Threat and Inappropriately Promoted Him.**

33. Approximately one month later, on August 24, 2020, Stinson emailed McGinnis to ascertain the results of the death threat investigation. McGinnis did not respond. Around the same time, Stinson sent an email to the University's Provost and Dean of Faculty to ascertain the results of the death threat investigation.

34. Neither party responded to the request. It was later discovered that McGinnis only inquired about Stinson during the investigation to other faculty members. When others only had favorable comments about Stinson, the investigation ended.

35. On September 1, 2020, instead of being reprimanded accordingly for the death threat and harassment, the Dean of the Dental School saved Jones from being fired. Jones was promoted to the role of Special Assistant for Strategic Initiatives for the Dean of the College of Dentistry, the Senior Vice President, and the Chief Operating Officer of the University's Health Science Center.

36. Though Jones was promoted, Stinson was required to work with him still and did her best to do so. After Jones's promotion, the faculty was asked to nominate an individual to replace Jones in his old role. When the faculty did so, and attempted to nominate a minority faculty member, the decision was taken out of their hands and a non-minority, non-clinical, Associate Dean at the University was chosen.

37. Subsequently, on September 14, 2020, Stinson met with Blanca Lupiani, the Dean of Faculties, to plead with her to move Jones to another area within the University. Stinson was terrified to continue to report to Jones. Despite Stinson's repeated efforts, her concerns regarding her safety continued to get ignored and Stinson's request was denied.

38. As time went on, Jones's retaliation against Stinson continued. On October 22, 2020, Jones sent an email to Stinson alleging, groundlessly, that she was not following the proper standard of care for her CPRIT patients. Jones threatened to withhold grant funding as a result.

39. Like before, Jones was attempting to interject himself into Stinson's CPRIT project and interfere with the execution of the grant and project. If successful, Jones would ultimately prevent Stinson from gaining tenure.

40. Stinson replied to the email and denied the baseless allegations. Stinson also requested a meeting to discuss the allegations and no meeting occurred. Jones's attempts to interfere with Stinson's work on the CPRIT project were somewhat successful. Stinson's team on the CPRIT project soon began to ignore Stinson's requests to advance the project.

41. Shockingly, on February 4, 2021, Stinson was notified that her office was broken into by Jones and his assistant, Marie "Rita" Rorie. The University did not notify Stinson as to the intrusion and attempted to hide the occurrence from Stinson. The University knew that

Stinson would react in panic after taking into account the death threat that Stinson reported against Jones. Subsequently, Stinson contacted the Dallas Police Department when she found out about the burglary.

42. Disturbingly, not long after Stinson's office was broken into, it was discovered that spy-surveillance software was installed on all faculty member computers. Stinson received notice of this on February 22, 2021. The computers were all configured by Jones. Stinson knew that her safety at work was completely compromised after this.

7. **Jones and Liescheski Blatantly Harass and Discriminate Against Stinson and Other Minorities**

43. On February 10, 2021, Stinson was set to work in the Agape Clinic with Liescheski. Unfortunately, Stinson had to call in sick, due to uncontrollable panic attacks after being notified of the office intrusion, and she reported her absence as early as possible. In response to calling out, Liescheski suggested that Stinson did not care about the clinic. Because of Liescheski's comment, it reaffirmed Stinson's belief that she could not take medical time from the clinic.

44. Consequently, Stinson began to feel anxious about taking medical time from work. Later that day, Liescheski sent a work email to Stinson requesting her prompt response about a patient's paperwork. In the email, Liescheski suggested that Stinson made a mistake in paperwork and inappropriately cc'd the Department Chair and Director of External Clinics. The constant harassment regarding Stinson missing work for medical reasons has contributed significantly to Stinson's anxiety.

45. A few days later, Jones created and sent out a survey to faculty members in order to evaluate the new Clinic Director, a person who reported Jones's breaking in of Stinson's

office. In the evaluation, Jones sought to discredit the Clinic Director and another minority faculty member in a leadership position.

46. Following Jones's break-in of Stinson's office, Stinson was re-assigned to the Juvenile Detention Center to keep her safe from Jones's attacks and constant harassment.

47. Despite this, Jones went out of his way to continue harassing Stinson, often visiting the other clinics, uninvited and unannounced, to see Stinson. This caused Stinson to develop extreme anxiety and severe panic attacks. Consequently, Stinson was placed on anxiety medications due to Jones's constant harassment.

8. **McGinnis Allowed Jones to Continue to Harass Stinson While He Was on Administrative Leave**

48. On March 16, 2021, faculty members were notified that the Dean of the College of Dentistry was forced into retirement. It was alleged that he was misappropriating school funds. This, as noted before, was the same person who was protecting Jones from being fired. Jones was alleged to be in on the conspiracy and was placed on administrative leave as a result.

49. While Jones was on administrative leave, his attempts to harass Stinson did not stop. Jones again intervened with Stinson's ability to deliver her commitments to the CPRIT project. As a result, Stinson reached out to the new Department Chair and administration at the University. Administration and the Department Chair informed Stinson that they could not help despite Stinson witnessing Jones threaten other faculty members, harass Stinson, and burglarize her office.

50. While Stinson was dealing with Jones on one end, she continued to deal with Liescheski on the other. On March 31, 2021, Stinson was working in the Agape Clinic with Liescheski. In doing so, Stinson created a lab case for a denture patient and left the case on the counter.

51. Liescheski noticed Stinson's lab case and discarded it, forcing Stinson to re-do the case. Further, Liescheski interfered with Stinson's patient care by altering patient schedules, treatment plans, and even hiding Stinson's prescription book from her. After interfering in these ways, both Liescheski and Jones made false complaints against Stinson's dental license, alleging that Stinson was abandoning her patients and neglecting them. Subsequently, Stinson emailed the University's administration to inform them of Liescheski and Jones's harassment. Stinson asked to no longer be subjected to their terror, but she received no response from anyone.

52. Jones was able to foster other allies in his endeavor to harass Stinson. Another faculty member went through all of Stinson's treatment notes from another clinic looking for mistakes to report. That faculty member found an alleged mistake and reported it to the University. Concerned, Stinson reached out to the Vice Department Chair on April 21, 2021, to ascertain information about the report. The Vice Department Chair confirmed that the faculty member made a complaint against Stinson but assured Stinson to not worry. However, this caused Stinson extreme stress and anxiety when she realized how far Jones would reach to affect Stinson.

53. Unsurprisingly, on April 8, 2021, Jones completely halted Stinson's work on the CPRIT project when he completely froze the grant funding the project. Additionally, Jones stopped all patient care and hiring processes for the project.

54. Sometime after April 8, 2021, Stinson went to the Associate Dean for Academic affairs to beg for help in re-starting the project and the Associate Dean refused to intervene. It did not matter that Jones was on administrative leave due to his negative behavior, the Associate Dean insisted that Stinson continue to work with Jones.

55. Given that Stinson was required to continue to work with Jones and continued to interfere with Stinson's work, Jones's efforts were ultimately successful, and Stinson was unable to produce much research without an adequate team or funding. Stinson was later penalized for this lack of research in performance reviews. Accordingly, Jones' and Liescheski's conspiracy continued against Stinson until well after April of 2021.

9. **Stinson's Placement on Protective Leave Did Not Stop Jones's Allies from Continuing to Harass and Discriminate Against Stinson.**

56. After visiting her doctor on June 18, 2021, Stinson was put on medical leave in accordance with the Family and Medical Leave Act (FMLA) for severe distress. Stinson accordingly provided all documentation needed for the FMLA leave. The University failed to communicate Stinson's leave to her department. Subsequently, Jones's former assistant, Mary "Rita" Rorie proceeded to report Stinson to the University as a "no call-no show" and attempted to get Stinson fired. It was only after Jones's ally attempted to get Stinson fired that she was notified that Stinson was on FMLA leave.

57. Despite being on FMLA leave, Stinson's leave was not respected, and Stinson was notified by the Vice Department Chair on July 6, 2021, that she was on the clinic schedule. The Vice Department Chair also asked Stinson to not cause any more retaliation in the Department or give others a reason to complain about her. After reaching out to her doctor, Stinson informed the Vice Department Chair that she would be out until July 30, 2021.

58. On June 30, 2021, Stinson was notified that Jones's employment had been terminated with the University. Despite this impeding termination, Stinson's concerns, complaints, and cries for help were all ignored by the University.

10. **Failure to Stop Workplace Harassment and Discrimination has Caused At Least Eleven Racial Minority Professors and/or Professionals to be Affected**

59. To date, at least eleven current or former employees of the University who worked for Jones and/or Liescheski and have experienced the same or similar harassment as Stinson. These individuals were primarily female, and all were people of color. Despite efforts by one or more of them, neither the University nor McGinnis took necessary action to protect these professors or stop the racial harassment and discrimination from Jones and/or Liescheski. The other similarly situated professors or dental professionals who were likewise discriminated against include:

- Dr. Laverne Holyfield: Former faculty in Public Health Sciences, Dean of Diversity (Black female).

- Kiara Ransom: Dental Assistant, Clinic Manager at the Juvenile Detention Center (Black female).

- Dr. Kishore Shetty: Director of Extramural Clinics (Indian male).

- Dr. Raed Ajlouni: Clinical faculty (Muslim/Middle Eastern male).

- Dr. Amal Noureldin: Clinical Faculty (Muslim/ Egyptian female).

- Dr. Peggy Timothe': Director of DPH graduate program & faculty in Public Health Sciences (Black female).

- Dr. Shirley Miranda: Former Clinical Faculty (Middle Eastern female).

- Dr. Marie Latortue: Former Clinical Faculty (Black female).

- Tyrencia Jefferson: former RDA at The Agape Clinic (Black female).

- Priscilla Diaz: Former RDA (Hispanic female).

- Dr. Kerin Burdette: Faculty (Black female).

**B.     The Hostile Work Environment Caused Stinson Severe Stress and Anxiety, Numerous Physical Ailments, Damage to Her Marriage, and Constructive Discharge**

60.     Starting in March of 2020, Stinson began to develop severe anxiety from working in the extremely hostile work environment. Stinson also began to lose weight and lose hair uncontrollably. Stinson's anxiety was causing her to not eat or sleep, and the stress was causing her hair to fall out. Around the same time, Stinson began having marital problems with her Husband due to the increased toll that work was taking on her. The work harassment caused Stinson's husband to want her to quit her job, but Stinson knew she could not quit without ruining her career trajectory. As a result, Stinson and her husband joined a marital support group.

**1.     Stinson Begins to Suffer Noncontrollable Panic Attacks**

61.     Stinson had her first noncontrollable panic attack on February 5, 2021. These attacks worsened and became frequent as time went on. Stinson was attempting to come to work, but the stress and anxiety of the hostile work environment was too much for her to bear. Around this time, Stinson's blood pressure also began to be an issue.

62.     Approximately one month after the noncontrollable and debilitating panic attacks began, Stinson went to her doctor and her doctor prescribed three anxiety medications to manage the attacks. Despite having the medication, anytime Stinson saw someone resembling Jones she had a panic attack. This increased Stinson's stress and anxiety and ultimately caused her to be prescribed more medications. It soon became apparent to Stinson that if she drove in the vicinity of the University or Agape Clinic, she would develop panic attacks. The panic attacks that Stinson experienced were so severe that Stinson's prescription medications had no effect on relieving them. Stinson ultimately began counseling because of

the unmanageable anxiety. By the time Stinson began counseling, she had been given ten prescriptions to combat her anxiety.

63. Stinson's blood pressure was extremely elevated due to the panic attacks and stress she was experiencing. She also started experiencing heart palpitations, insomnia, depression, headaches, faintness, shortness of breath, and hypertension. Fearful that the stress and anxiety of working in such a hostile work environment was causing heart issues, Stinson underwent an EKG test to rule out heart problems or arrhythmias.

2. **Stinson's Harassers Robbed Her of Her Dignity and Destroyed Her Ability to Ever Work at the University Again**

64. In April of 2021, Stinson experienced the worst panic attack to date. Stinson, as a 35-year-old woman, was walking into the Agape Clinic and had a panic attack that caused her to completely empty her bladder. Stinson's doctor referred her to a urogynecologist where she was diagnosed with pelvic floor muscle spasm. To help gain control of her bladder again, Stinson has had to undergo pelvic floor therapy. However, while still undergoing this therapy, Stinson must wear incontinence pads daily, as she is unsure when her next panic attack will hit or when she will next lose control of her bladder.

65. In May of 2021, Stinson had a panic attack while at the Agape Clinic and while working on a patient. Stinson was in the middle of a tooth extraction when it began. Stinson became sweaty, clammy, and nearly passed out causing other team members to intervene to get her stable. Stinson also experienced nausea, vomiting, profuse sweating, heart palpitations and hyperventilation. That day, Stinson also had severe dehydration and was treated with IV fluids and Zofran.

66. In June of 2021, Stinson's symptoms of persistent nausea continued, and she started to develop severe abdominal pain. Stinson developed stomach gastritis due to the stress

of her work environment. Stinson also developed irritable bowel syndrome (IBS) and her doctor believes that the stress from work was the cause. Stinson was prescribed more medication for the health issues and is still trying to investigate the full effects that the hostile work environment has had on her health. To date, Stinson's blood pressure has not returned to a normal level, despite never having issues with blood pressure in the past.

67. Accordingly, the conduct of Jones and Liescheski in harassing, discriminating, and retaliating against Stinson based on race and reporting racial discrimination was a continuing violation and/or continuing conduct. Likewise, the acts or omissions of McGinnis was a continuing violation and continuing conduct. The affirmative acts and omissions of Jones, Liescheski, and/or McGinnis created a hostile work environment and resulted in her inability to return to work and has created a constructive discharge of her employment in violation of 42 U.S.C. at Sections 1981 and 1983.

### III. CAUSES OF ACTION - (42 SECTION 1981 RACIAL DISCRIMINATION/RETALIATION UNDER 42 SECTION 1983)

30. Plaintiff realleges each allegation set forth in the paragraphs above.

31. Defendants working together acted to violate the civil rights of Plaintiff Stinson in whole or in part based on his race and or retaliation for informing management and others that she was filing a claim or claims of race discrimination.

32. Defendant McGinnis is independently liable for his actions as a supervisor who knew or should have known that Defendants Jones and Liescheski were engaged in a conspiracy to violate the Plaintiff's civil rights, but acting under color of law, he acted with deliberate indifference to the Plaintiff's constitutionally protected rights, failed to prevent the on-going violations of her civil rights, and actively took steps to sweep these violations under the rug in order to protect the University from perceived reputational harm. *See, e.g., Feltonn v. Polles*,

315 F.3d 470, (5th Cir. 2002) *overruled on other grounds by Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006); citing, *Southard v. Texas Bd. of Criminal Justice*, 114 F.3d. 539, 550 (5th Cir. 1997).

33.     Defendants' acts or omissions were committed with malice and/or reckless disregard.

34.     Plaintiff seeks and requests that the Court award back pay, that is the payment of wages lost prior to trial; either the equitable remedy of reinstatement or an equitable determination that reinstatement is unfeasible and the equitable award of front pay; other direct and consequential compensatory damages, including without limitation, mental anguish, emotional distress, loss of enjoyment of life, and damage to reputation; punitive damages; plus, attorney fees and cost of court; and any and all other damages in law or compensation in equity that the Court deems just and right.

## JURY DEMAND AND MISCELLANEOUS MATTERS

### Jury Demand

66.     Plaintiff respectfully requests a jury trial on all legal issues so triable.

## VI.     PRAYER

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays that Defendant be cited to appear and answer herein, and that on final trial, Plaintiff have and recover Judgment against Defendant with the following relief:

(1)     A determination that the Defendants, separately or collectively, violated the Plaintiff's civil rights through their course of conduct and actions and omissions in violation of the 42. U.S.C. at Sections 1981 and 1983.

(2)     Award of past pecuniary losses, and lost wages, and lost benefits from the time of termination until the time of trial;

(3)     Award compensatory legal damages, including damages for past and

future mental anguish, emotional pain and suffering, inconvenience, loss of enjoyment of life, emotional distress, physical distress, and other nonpecuniary losses;

(4) Award prejudgment and post-judgment interest at the maximum legal rate;

(5) Award costs of court, including expert witness fees; attorneys' fees; and all such other and further relief in law or equity to which Plaintiff may be justly entitled.

Respectfully submitted,

/s/ Eric N. Roberson

Eric N. Roberson
State Bar No. 00792803
ENR@kilgorelaw.com
Kilgore & Kilgore, PLLC
3141 Hood Street, Suite 500
Dallas, Texas 75219
(214) 379-0817
(214) 379-0836 (telecopy)
**ATTORNEY FOR PLAINTIFF**
**CRYSTAL STINSON, DDS, PHD**